UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LAUREN RIDENHOUR,

                Plaintiff,

    -against-                            **AMENDED COMPLAINT**

BETTINA SULSER BRYANT and DONALD
L. BRYANT, JR.                                    19 CV 2587

                Defendants.
------------------------------------------------------------------X

        Plaintiff Lauren Ridenhour, by her attorneys Kraus & Zuchlewski LLP, as and for her Amended Complaint, alleges as follows:

## INTRODUCTION

1.    Ms. Ridenhour, a financial consultant to family offices on banking relationships and related matters, brings this action for breach of an oral contract and in *quantum meruit* against Bettina Sulser Bryant and Donald L. Bryant, Jr., (the "Bryants" or "Defendants"). Ms. Ridenhour alleges that Defendants have failed and refused to compensate her for services rendered in connection with renegotiating the terms of a $98,459,169 million loan to Mr. Bryant with JP Morgan Chase ("JPMC"), secured by an art collection valued in excess of $300 million. Ms. Ridenhour further alleges that the reason Mrs. Bryant precipitously terminated her engagement and refused to compensate her for her services was because Ms. Ridenhour questioned the accuracy of financial documents prepared in connection with the loan and refused to submit misleading financial documents to JPMC.

2.    Ms. Ridenhour seeks no less than $400,000, the amount of her fee for her services negotiating the underlying loan, plus interest and other appropriate remedies.

## JURISDICTION AND VENUE

3.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C §1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

4.      Venue is proper in this Court because Ms. Ridenhour is domiciled within this judicial district and the majority of events related to Ms. Ridenhour's claims occurred within this District.

## THE PARTIES

5.      Ms. Ridenhour is a United States citizen domiciled in New York, New York. She is a citizen of the State of New York.

6.      Upon information and belief, Mr. and Mrs. Bryant are United States citizens domiciled in St. Helena, California and citizens of California.

## FACTS

### Ms. Ridenhour

7.      Ms. Ridenhour holds a Bachelor's Degree in business administration and marketing and a Master's Degree in business administration with an emphasis in management information systems.

8.      Since 2006, Ms. Ridenhour has held various professional positions in finance. She has been on the wealth strategy team at U.S. Trust/Bank of America Private Wealth Management, worked in public finance investment banking at Stifel Nicolaus and was a specialist at JPMC's Private Bank.

9.      Since 2014, Ms. Ridenhour has been a consultant to private family offices.

### The Bryants Engage Ms. Ridenhour 2014 - 2018

10. (a) In or about May 2014, Mrs. Bryant engaged Ms. Ridenhour for work related to the Bryant Vineyards, Ltd. ("Winery"). For those services the Winery initially compensated Ms. Ridenhour as a consultant and later as an employee earning a $150,000 base salary, plus commissions for sales generated from new relationships that Ms. Ridenhour cultivated for the Winery.

(b) The Winery paid Ms. Ridenhour via Winery check and it withheld customary taxes. The Winery reported her income on an Internal Revenue Services ("IRS") Form W-2. In addition, Ms. Ridenhour received medical benefits and participated in the Winery employees' 401(k) plan.

11. In or about the summer of 2015, the Bryants separately engaged Ms. Ridenhour to negotiate a $100 million loan to Mr. Bryant secured by their valuable art collection held by the Donald L. Bryant Jr. Art Trust (the "Trust") which includes works by Willem de Kooning, Jasper Johns, Ellsworth Kelly, Jackson Pollack, Pablo Picasso and Gerhard Richter.

12. The Trust is located in St. Louis, Missouri. Since in or about July 2017 the Trust has been managed by three trustees - Mrs. Bryant, Becky Hubert and Thomas R. Corbett, who also serves as counsel to the Trust (collectively, "Trustees").

13. The Bryants and Ms. Ridenhour agreed that she would receive a fee based upon any value added that she would negotiate in the loan's terms.

14. There was no written agreement between the Bryants and Ms. Ridenhour because the Bryants wished to avoid memorializing compensation arrangements for individuals working on behalf of the Trust for, among other reasons, the Trust had not been paying trustee fees to Ms. Hubert.

15. Ms. Ridenhour spent the next approximately nine months negotiating the terms of the loan.

16. Ms. Ridenhour's skill and expertise resulted in a savings of approximately $3 million in interest over the renewed three-year loan term which would become due in April 2019.

17. After completing the loan transaction, Ms. Ridenhour sent the Bryants a spreadsheet detailing the reason for her request for $617,958 as compensation for having negotiated the JPMC loan. (Exhibit A.) The parties subsequently agreed that Ms. Ridenhour's fee would be $400,000.

18. The Bryants paid Ms. Ridenhour for the loan negotiation in two separate personal checks, each for $200,000, a total of $400,000. No taxes were withheld, and Ms. Ridenhour received an IRS 1099 tax form.

### Ms. Ridenhour's 2018 Loan Negotiation Engagement

19. On May 31, 2018,[1] Mrs. Bryant and Ms. Ridenhour met in the Bryants' St. Helena home to discuss various matters, including the loan negotiations. They agreed that Ms. Ridenhour would be separately compensated for her work on the loan as she previously had been compensated – based upon the value that she would add to the new loan's terms.

20. Because Mrs. Bryant recognized that there would be a delay in Ms. Ridenhour's receiving compensation, she wired a $100,000 loan from her personal account to Ms. Ridenhour.

21. With the loan due to expire in 10 months, on June 1, Ms. Ridenhour participated in a conference with the Trust's three Trustees and Ms. Hubert's attorney Robert Oesch. The Trustees, including Mrs. Bryant, directed Ms. Ridenhour to contact JPMC to begin discussions

---

[1] Unless otherwise indicated, all dates which follow are 2018.

4

about the loan's renewal terms. In addition, they directed Ms. Ridenhour to explore the terms available at other banks.

22. Once again, Ms. Ridenhour had no written agreement about the specific compensation for her services. Instead, she reasonably relied upon her prior course of dealing with the Bryants, the positive financial outcome of her prior engagement and her May 31 conversation with Mrs. Bryant.

23. At no time did any Trustee or the Bryants claim that Ms. Ridenhour's $150,000 Winery salary would include compensation for renegotiating the bank loan.

24. For a variety of reasons, this JPMC loan renewal required substantially more effort for Ms. Ridenhour than her work negotiating the prior loan.

25. Among the more significant issues was that there were now three trustees, all of whom were involved in negotiations in varying degrees, and, upon information and belief, with competing interests.

26. To ensure that Mr. Bryant, the borrower, would receive the most favorable loan terms, Ms. Ridenhour investigated options at other banks. In addition to 54 meetings and a multitude of calls with JPMC, Ms. Ridenhour had discussions with BMO (Bank of Montreal) Harris Bank and Morgan Stanley.

27. Ms. Ridenhour lead the negotiations with JPMC for renewal of the loan to Mr. Bryant. This was a complex process including analysis of fluctuations of interest rates and projection of the London Inter Bank Overnight Rate, *i.e.*, LIBOR, with some of the most senior banking and credit executives at JPMC. Moreover, Ms. Ridenhour was attempting to strike a deal while JPMC was changing its loan focus from asset based collateral, *e.g.*, valuable art, to cash flow lending.

28. The loan negotiations primarily were conducted in New York City and all records related to the loan were maintained in New York City.

29. JPMC required extensive information and documentation to renew the loan, including a detailed analysis of the Bryants' personal financial assets.

### The Winery Valuation Dispute

30. (a) On or about June 20, Ms. Ridenhour reviewed the Bryants' draft personal financial statement ("PFS"), that they intended to submit to JPMC. In addition to questioning the accuracy of income streams from Mr. Bryant's insurance company and other income sources, Ms. Ridenhour observed that the Bryants represented the Winery's valuation at an exceedingly generous $125 million.

(b) The valuation was 25% above the prior valuation of $100 million stated in the personal financial statement provided only nine months earlier. However, this valuation was inaccurate, as the Winery suffered from excessive back inventory as of July 2018 of over $14 million in prior vintages and an approximate 40% decline in sales over the last three years.

31. Ms. Ridenhour's valuation research revealed no previous valuations, based on the books of the Winery, able to support anywhere near either the $100 million valuation offered in 2017 or the $125 million valuation provided in 2018.

32. (a) To the contrary, a representative of International Wine Associates ("IWA"), which represented the Donald L Bryant, Jr., Revocable Trust, stated in a conference call on Friday, October 26, that IWA was projecting their final valuation of the Winery to be significantly lower than $100 million, possibly 30 to 40% lower (*i.e.* $60 – $70 million).

(b) During this conference call Mrs. Bryant became angry, denying that the $125 million valuation amount was incorrect. Ms. Bryant demanded that IWA show very high

6

sales numbers projections for the 2019 vintage. This was the last phone conversation Ms. Ridenhour had with Mrs. Bryant.

(c) Upon information and belief, based on Mrs. Bryant's statements, Mrs. Bryant then insisted that IWA show extremely unlikely increased growth projections for the January 2019 release for the Winery.

33. A majority of the annual income reflected on the 2018 JPMorgan PFS is gross income from the Winery, without the deduction of expenses. That resulted in the total annual income being overstated by approximately 40% to 50%, because Winery expenses were not included.

34. Ms. Ridenhour questioned Mrs. Bryant who asserted that the current valuation had been determined in some unspecified way by comparison with the recent sale of the Colgin vineyard to LVMH for an undisclosed sales price. Ms. Ridenhour explained that this "valuation" was speculative and not a relevant comparison because of lack of price information, failure to consider the size of the Colgin vineyard and amount of its production.

35. On June 29, Mrs. Bryant's personal assistant emailed (with a copy to Ms. Ridenhour and others) a draft PFS to JPMC representing the Winery valuation to be $125 million.

36. On June 30, Ms. Ridenhour spoke with Mr. Corbett six times over almost three hours expressing her serious concerns about Mrs. Bryant's financial submission to JPMC. They discussed a need for a professional valuation of the Winery as well as the need to review and confirm the accuracy of other financial information on the Bryants' PFS.

37. On September 10, Ms. Ridenhour met with the Trustees, the Winery's Board Chair and Mr. Corbett's attorney Jack Musgrave and Mr. Oesch in St. Louis, Missouri. James

7

Rose, the Winery's counsel and a Winery Board member, attended by phone. Ms. Ridenhour expressed her view that Mrs. Bryant's personal financial statement was misleading and would need to be corrected for JPMC as well as for any other bank that she may approach.

38. At that meeting, Ms. Ridenhour went over line by line with all attendees why the income represented was not correct on the 2018 and 2017 signed PFS submitted by the Bryants to JPMC.

39. The just finalized 2017 Winery financials showed the net income of the Winery at $2.5 million, while the signed 2018 PFS showed the 2018 Winery income projection between $6 to $7 million. However, because of added expenses and decreasing mailing list sales, the estimated 2018 net income of the Winery was expected to be less than the $2.5 million 2017 number and likely closer to $1.8 million – significantly less than the $6- $7 million amount the Bryants reported to JPMC.

## Mrs. Bryant Terminates Ms. Ridenhour's Engagement

40. Despite the disagreement over the Bryants' financial statement and the value of the Winery, Ms. Ridenhour spent the remainder of September and most of October 2018 addressing other requirements for the loan.

41. For example, in the ensuing seven weeks, Ms. Ridenhour had numerous meetings, phone calls and emails with the two consultants working on valuations of the Winery - one engaged by the Trust, the other hired by a prospective buyer.

42. During that time, Ms. Ridenhour continued to express her concerns to the Trustees about the accuracy of the Bryants' personal financial statement.

43. On October 29, Mrs. Bryant emailed Ms. Ridenhour directing her to cease discussions with all banks, including JPMC, until further notice.

44. On November 3, Mrs. Bryant sent an email to Ms. Ridenhour stating, in relevant part:

> I truly appreciate the support and dedication you have shown Don and me the past several years .... It is just time for me to pursue different solutions ....
>
> You have a lot of talent and I know you will find satisfaction with the many other clients you have cultivated.

45. The Winery paid Ms. Ridenhour salary and benefits for her work at the Winery through the end of 2018.

46. Mrs. Bryant made no payment for Ms. Ridenhour's services in connection with the loan negotiations for which Ms. Ridenhour had done substantial work, similar to the work that she had done in connection with the prior loan for which she had received a $400,000 fee.

47. Upon information and belief, Mrs. Bryant terminated Ms. Ridenhour's services because Ms. Ridenhour questioned the validity of Mrs. Bryant's financial representations to JPMC and refused to provide inaccurate financial information to JPMC, denying Ms. Ridenhour the compensation that she had earned.

## AS AND FOR A FIRST CAUSE OF ACTION

### Breach of Oral Contract

48. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 47 inclusive as though fully set forth herein.

49. Defendants made a clear and unambiguous promise to Plaintiff that if she obtained favorable loan terms she would be compensated both for the time she expended on this effort and for the results she obtained.

50. Plaintiff could perform her obligations within one year.

51. Plaintiff reasonably relied on that promise and fulfilled Defendants' terms.

52. Defendants breached their promise to Plaintiff, causing her substantial financial injuries.

## AS AND FOR A SECOND CAUSE OF ACTION
## JURY DEMAND

### Quantum Meruit

53. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 52 inclusive as though fully set forth herein.

54. Plaintiff performed services in connection with renegotiating of the loan in good faith.

55. The Bryants accepted the services performed by Plaintiff.

56. Plaintiff had a reasonable expectation of compensation by Defendants for her work.

57. The reasonable value of Plaintiff's services is $400,000 or more.

58. *Quantum meruit* requires that Plaintiff be paid the compensation she is due from Defendants.

Plaintiff demands a trial by jury on all counts.

**WHEREFORE,** Plaintiff respectfully prays that this Court:

59. Issue a judgment declaring that Defendants' actions violated Plaintiff's rights under the doctrine of *quantum meruit*;

60. Declare that Defendants are estopped from not paying Plaintiff the compensation she is owed pursuant to her verbal understanding and emails with Defendants; and

10

61.   Order that Defendants pay Plaintiff:

    a.   all compensation required by her agreement with Defendants (which is at least $400,000), plus interest; and

    b.   other and further relief as may be just and proper.

Dated: New York, New York
April 22, 2019

                          KRAUS & ZUCHLEWSKI LLP
                          *Attorneys for Plaintiff*

By: _____
Pearl Zuchlewski (PZ 2926)
60 E. 42nd Street, Ste. 2534
New York, New York 10165
(212) 869-4646
pz@kzlaw.net